

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 11, 2019**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 16-41283-ELM-7 |
| GREGORY G. JONES, | § | |
| | § | Chapter 7 |
| Debtor. | § | |
| | § | |
| MARILYN GARNER, Chapter 7 Trustee | § | |
| of the Bankruptcy Estate of Gregory G. Jones, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 18-04098 |
| | § | |
| RICHARD SHERWOOD and | § | |
| LESA SHERWOOD, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Before the Court is the *Motion for Summary Judgment* [Docket No. 17] (the "**Motion**")

filed by Defendants Richard Sherwood ("**Mr. Sherwood**") and Lesa Sherwood (together with Mr.

Sherwood, the "**Defendants**").  In support of the Motion, Defendants have filed their *Brief in*

*Support of Motion for Summary Judgment* [Docket No. 19] ("**Defendants' Brief**") and *Affidavit*

of *Richard Sherwood* [Docket No. 20] (the "**Sherwood Aff.**"). In opposition to the Motion, Plaintiff Marilyn Garner ("**Plaintiff**"), in her capacity as Chapter 7 trustee of the bankruptcy estate of the Debtor Gregory G. Jones, has filed *Plaintiff's Opposition to Defendants' Motion for Summary Judgment* [Docket No. 21], *Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment* [Docket No. 22] ("**Plaintiff's Brief**"), and *Appendix to the Brief in Support of Opposition to Defendants' Motion for Summary Judgment* [Docket No. 23] ("**Plaintiff's App.**").

On April 1, 2016 (the "**Petition Date**"), the Debtor Gregory G. Jones ("**Jones**") initiated the underlying bankruptcy case associated with this adversary proceeding with the filing of his voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* (the "**Bankruptcy Code**"). By order entered on April 28, 2016, the bankruptcy case was converted to a proceeding under Chapter 7 of the Bankruptcy Code, whereupon the Plaintiff was appointed to serve as the Chapter 7 trustee. On March 29, 2018, Plaintiff commenced this adversary proceeding with the filing of *Trustee's Original Complaint Against Richard and Lesa Sherwood* [Docket No. 1] (the "**Complaint**"). The Complaint focuses on a $277,486.19 payment made from funds of Jones to the Defendants (the "**Transfer**") on August 11, 2015 – a date within one year, but prior to 90 days, of the Petition Date. Pursuant to the Complaint, Plaintiff seeks to avoid the Transfer as a fraudulent transfer pursuant to Section 548 of the Bankruptcy Code or, alternatively, as a preferential transfer pursuant to Section 547 of the Bankruptcy Code. Defendants assert that they are entitled to summary judgment on both of Plaintiff's avoidance claims.

For the reasons set forth below, the Court will grant the Defendants' Motion.

### *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc*

*(Miscellaneous Rule No. 33)* of the United States District Court for the Northern District of Texas. Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F) and (H). Pursuant to 28 U.S.C. § 157(b)(1), coupled with the Defendants' knowing and voluntary waiver of the right to adjudication of the causes of action asserted in this proceeding by an Article III court, this Court may enter a final order or judgment.[1]

## FACTUAL BACKGROUND

**A.     *Establishment of the Parties' Relationship; The Sortium Engagement and Aquaphex Revenue Share Agreement***

The Defendants and Jones first met as neighbors in Southlake, Texas. In the course of getting to know one another, they obtained knowledge about what each did for a living – Mr. Sherwood, for example, learning that Jones was a practicing attorney with his own firm; and Jones learning that Mr. Sherwood was the owner of a business named Sortium USA, LLC ("**Sortium**"). This familiarity would later serve as the catalyst for Sortium's engagement of Jones and his law firm to represent Sortium in a copyright infringement case (the "**Sortium Engagement**").

Approximately two years into the Sortium Engagement, Jones began to tell Mr. Sherwood more about his own business venture – AquapheX[TM] Total Water Solutions, LLC ("**Aquaphex**"), a company that Jones claimed would use molecular filtration technology to remove contaminants from used fracking water in the oil and gas industry. Claiming to have personally invested $2

---

[1] Based upon the nature of the causes of action asserted and the absence of the filing of a proof of claim in the Debtor's bankruptcy case by either of the Defendants, *Stern*-based Constitutional limitations to the Court's exercise of power must be considered. *See Stern v. Marshall*, 131 S.Ct. 2594 (2011). Here, however, the Defendants have knowingly and voluntarily waived any right that they have to adjudication of the claims by an Article III court, thereby clearing the path to the entry of a final order or judgment by this Court. *See* Defendants' *Notice of Designation of Consent* [Docket No. 33], at p.2 (¶ 1); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 1942-48 (2015) (permitting final adjudication by bankruptcy court where there is a knowing, voluntary waiver of the right to adjudication by an Article III court).

million of his own money in the business, Jones offered the Defendants the opportunity to also invest in the business through the acquisition of a revenue-sharing interest in Aquaphex's first six plants for $250,000. The Defendants agreed, and in November 2013 entered into a written agreement with Aquaphex and Jones (the "**Revenue Share Agreement**"). *See* Complaint, Exh. A. The $250,000 payment required of the Defendants under the Revenue Share Agreement was funded out of loan and/or sales proceeds generated from real property that the Defendants owned in Seven Points, Texas.[2]

Under the terms of the Revenue Share Agreement, in exchange for the $250,000 payment the Defendants acquired the right to receive 1% of the net income of Aquaphex's first six plants over a maximum period of 10 years, with an overall guaranteed minimum return on investment of at least the initial $250,000 investment plus an additional $250,000,[3] such guaranteed return on investment to be equally allocated among the six plants with each plant's allocated share to be paid by the end of the 5th year of the plant's operations. *See* Revenue Share Agreement, at pp.1-2. Then, upon the earlier of (a) the end of the 10th year of operations of each particular plant, or (b) the sale of the plant, the Defendants' revenue sharing interest in relation to such plant's operations

---

[2] The transactional history associated with the payment is somewhat tortured. The Defendants assert that Jones, knowing that the Defendants planned to fund the $250,000 investment from the sale of the Seven Points property, forged the Defendants' signatures to certain loan documents associated with the property, apparently in order to obtain immediate access to the agreed-upon $250,000 investment via a loan secured by the property. Thereafter, once the property was sold, the loan was paid off and the Defendants were credited with making the $250,000 payment under the Revenue Share Agreement. *See* Sherwood Aff., ¶¶ 12-15. For purposes of this Memorandum Opinion, because Plaintiff acknowledges that the $250,000 payment was, in fact, made by the Defendants, it is not necessary to determine whether Jones engaged in the fraudulent conduct alleged or the specifics of how the payment was made. *See* Complaint, ¶ 13 (alleging that $250,000 payment made); Plaintiff's App. 35, at p.57 (Jones Affidavit, ¶ 6) (affirming payment).

[3] The minimum return on investment language of the Revenue Share Agreement is convoluted, inasmuch as the agreement purports to provide for a total minimum return on investment of $750,000, but after only referencing recovery of the initial $250,000 invested plus an additional $250,000 return on that investment. *See* Revenue Share Agreement, at p.1 ("The calculation of the minimum return on investment for $250,000.00 will be the return of the $250,000.00 plus an additional $250,000.00 *for a total of $750,000.00* minimum to be paid to the investor") (emphasis added). For purposes of this Memorandum Opinion, it is not necessary to determine whether the parties intended the actual minimum return on investment to be $250,000, $500,000 or $750,000.

would be subject to buyout. *See id.*, at p.2. While not expressly provided for in the Revenue Share Agreement, Jones claims that the Defendants were also made part of the "advisory board" or "executive team" of Aquaphex upon funding the investment. *See* Plaintiff's App. 35, at p.57 (Jones Affidavit, ¶ 7).

## B.   *The Jones Agreement*

By May 2014, seeing no progress in the construction of any of the Aquaphex plants, sensing no ability of Aquaphex to attract the level of additional capital required to achieve the stated goals of the company, and having received no return on the $250,000 investment, Mr. Sherwood began to make demands for information about the company and its operations and funding. In response, Jones presented the Defendants with a new proposal – one that Jones claimed would enable them to both "recover [their] initial investment asap and be in the heart of AquapheX and on the AquapheX$^{TM}$ Board of Directors (not just the Advisory Board)." Plaintiff's App. 16, at p.20 (May 20, 2014 email from Jones to the Defendants). To obtain these benefits, however, the proposal would require the Defendants to invest an additional $240,000. The Defendants agreed (the resulting agreement referred to herein as the "**Jones Agreement**").

To memorialize the new, agreed-upon investment obligation, the Defendants entered into a Share Purchase Agreement, dated June 2, 2014 (the "**Share Purchase Agreement**" or "**SPA**"). *See* Sherwood Aff., Exh. F. Per the agreement's introductory paragraph, the parties to the agreement were "Gregory G. Jones, CEO and President of AquapheX$^{TM}$ Total Water Solutions, LLC" (defined in the SPA as the "Seller"); "Gregory G. Jones, an individual" (defined in the SPA as the "Beneficiary"); and the Sherwoods (defined in the SPA as the "Purchaser"). *See* SPA, at p.1. Pursuant to the Share Purchase Agreement, the parties agreed to the following:

- The Seller's sale, and Purchaser's purchase, of four Aquaphex shares, representing 4% of the equity interests in Aquaphex (as of June 2, 2014) for $240,000.  SPA, ¶ 1.

- The Purchaser's payment of the $240,000 purchase price directly to Beneficiary.  SPA, ¶¶ 2-3.

- The assurance that Jones, having a majority of the Aquaphex shares, would appoint Mr. Sherwood as a member of the Board of Directors of Aquaphex for a minimum of one term.  SPA, ¶ 6.x.

- The confirmation and acknowledgment that, following the closing, Jones would pay $250,000 to the Defendants to be "considered as re-payment of the [Defendants'] original investment in AquapheX$^{TM}$," thereby "allow[ing] for Rick and Lesa Sherwood to have a full recovery of all of their initially invested funds prior to the opening of any of the AquapheX$^{TM}$ plants or other operations" – such payment to be made over a nine-month period in monthly payments commencing on June 30, 2014, and to be credited towards amounts payable by Aquaphex to the Defendants under the Revenue Share Agreement.  SPA, ¶¶ 6.y.-6.z.

- Aquaphex's agreement to reimburse Jones for the $250,000 that he pays to the Defendants, such reimbursement to come from net income that otherwise would have been payable to the Defendants under the Revenue Share Agreement.  SPA, ¶ 6.y.

In June 2004, the Defendants paid the required $240,000 to Jones.  Sherwood Aff., ¶ 19.

Thereafter, in September 2014, following Jones' failure to make the promised June, July and August 2014 installment payments to the Defendants under the Jones Agreement, as described in the Share Purchase Agreement, the Defendants obtained Jones' execution of a promissory note, dated as of June 2, 2014 (the date of the Share Purchase Agreement), in the principal amount of $250,000 (the "**Initial Investment Note**"), to document his payment obligation.  *See* Sherwood Aff., ¶ 20; *see also* Complaint, ¶ 18.  It was during this time frame that Jones also provided the Defendants with greater visibility into, and involvement in, Aquaphex's capital raising efforts, as contemplated by the Jones Agreement and Share Purchase Agreement.  Among other things, Jones regularly copied Mr. Sherwood on email communications with prospective investors, sources of additional capital and potential customers, and Jones included Mr. Sherwood on internal email

communications among other advisory board members, investors and business partners.  *See generally* Plaintiff's App. 1-12, 17-29; *see also* Plaintiff's App. 35 (Jones Affidavit, ¶¶ 8-12).

### C.      The Sortium Overbilling Dispute and Initial Law Practice Note

Separately, in and around May 2014, Mr. Sherwood complained to Jones about the alleged overbilling of Sortium by Jones and his law firm for legal services rendered in connection with the Sortium Engagement.  As the owner of Sortium upon its apparent wind-up and termination, Mr. Sherwood asserted that he was the successor in interest to any rights and claims that Sortium held in relation to such alleged overbilling.  *See* Sherwood Aff., ¶ 22.  While Jones would later conclude that Sortium was not, in fact, overcharged, in September 2014 he nevertheless agreed to resolve the dispute by executing an additional note, dated September 7, 2014, in the original principal amount of $83,451.4, which he made payable to the Defendants (the "**Initial Law Practice Note**").  *See* Plaintiff's App. 35, at p.58 (Jones Affidavit, ¶ 17); Complaint, ¶ 20; Sherwood Aff., ¶ 3.

### D.      The Notes Mature and the Note Obligations are Restructured and Collateralized

In March 2015, following the final maturity of the Initial Investment Note[4] and the Initial Law Practice Note[5] and the failure of Jones to make any payments under either of the notes, the Defendants engaged counsel.  Complaint, ¶ 21.  With the assistance of counsel, the Defendants obtained Jones' agreement to a restructuring and collateralization of the note obligations, as follows:

- The Initial Investment Note was replaced with a new Promissory Note, dated March 2, 2015, in the original principal amount of $277,486.19 (being the unpaid balance of the Initial Investment Note plus accrued interest), payable in five equal bi-monthly installments, plus interest, commencing on August 1, 2015 with a final maturity of April 1, 2016 (the "**Investment Note**").  *See* Sherwood Aff., ¶¶ 3, 20 & Exh. B; *see also* Complaint, ¶ 21.

---

[4] Based upon the payment schedule of the Share Purchase Agreement, the due date for Jones' final payment of principal under the Initial Investment Note, and thus the final maturity of the note, was February 28, 2015.  *See* Share Purchase Agreement, ¶ 6.z. (payment schedule).

[5] The final maturity of the Initial Law Practice Note was January 22, 2015.  *See* Complaint, ¶ 20.

- The Initial Law Practice Note was replaced with a new Promissory Note, dated March 2, 2015, in the original principal amount of $92,395.85 (being the unpaid balance of the Initial Law Practice Note plus accrued interest), payable in five equal bi-monthly installments, plus interest, commencing on July 1, 2015 with a final maturity of March 1, 2016 (the "**Law Practice Note**" and together with the Investment Note, the "**Promissory Notes**"). *See* Sherwood Aff., ¶¶ 3, 20 & Exh. A; *see also* Complaint, ¶ 21.

- Jones executed a Security Agreement, dated March 2, 2015 (the "**Security Agreement**"), pursuant to which he pledged various assets to the Defendants as security for payment of the Promissory Notes. *See* Sherwood Aff., ¶ 4 & Exh. C; *see also* Complaint, ¶ 21. Among the assets pledged were all of Jones' right, title and interest in accounts, accounts receivable, income and all other receipts (or rights to receipts) owed to or received by Jones, including from a federal lawsuit captioned *Lou Haddock as Trustee of the Flyte Tool & Die, Incorporated Deferred Compensation Plan, et al. v. Nationwide Financial Services, Inc. and Nationwide Life Insurance Co.*, Case No. 3:01-CV-1552-SRU, U.S. District Court, District of Connecticut (the "**Class Action Litigation**"). *See* Sherwood Aff., Exh. C (Security Agreement, ¶ 1.2(a)-(b)); *see also* Complaint, ¶ 9 (describing Jones' interest in Class Action Litigation).

**E.** **Jones' Receipt of His Share of the Class Action Litigation Settlement Proceeds; His Engagement of Counsel and Payment of the Transfer to the Defendants**

In or about early July 2015, all issues related to settlement of the Class Action Litigation were resolved and, based upon the final resolution, Jones personally received $1,584,000 of the settlement proceeds. *See* Complaint, ¶ 10; Plaintiff's App. 33, at p.46 (Yale Affidavit, ¶ 2). Due to the many challenges that Jones was facing at the time, he decided to hire counsel – Roger Yale ("**Yale**") of the Yale Law Group – to take possession of the settlement funds and provide counsel to, and assist, Jones in negotiating with creditors and making disbursements from the settlement funds. As explained by Yale, because Jones "was the subject of pending disciplinary actions before the State Bar, was being sued by the SEC, had numerous unpaid creditors, and had just agreed to surrender his law license, Mr. Jones wanted these funds out of his hands and he requested my [Yale's] assistance and counsel in the distribution of the funds." Plaintiff's App. 33, at p.46 (Yale Affidavit, ¶ 3).

Yale agreed to the engagement and held the settlement funds in a business money market bank account under the name "Roger M. Yale Attorney At Law FBO Gregory G. Jones." Once it was determined, with the approval and direction of Jones, that a payment from the funds would be made to a particular creditor, Yale would transfer the amount of the payment from the money market account to his law firm IOLTA account, followed by the issuance of a check from the IOLTA account to the creditor payee. Plaintiff's App. 33, at p.46 (Yale Affidavit, ¶ 5).

Learning of Yale's involvement, the Defendants enlisted the assistance of their own counsel – Debra Edmondson ("**Edmondson**"). *See* Sherwood Aff., ¶ 2. On July 9, 2015, Edmondson sent Yale a letter detailing the outstanding balances owed on the Law Practice Note (which she referred to as "Promissory Note #1") and the Investment Note (which she referred to as "Promissory Note #2"). *See* Plaintiff's App. 33, at p.46 (Yale Affidavit, ¶¶ 7-8). Following negotiations that took place between Yale and Edmondson, Jones authorized Yale to pay off the Investment Note. *See* Plaintiff's App. 33, at p.46 (Yale Affidavit, ¶ 6) ("I [Yale] attempted to negotiate with the counsel for the Sherwoods, through Debra Edmondson"); Plaintiff's App. 35, at p.58 (Jones Affidavit, ¶ 16) (authorization of Yale to pay Investment Note). Accordingly, following the disbursement mechanics described above, Yale issued a check from his IOLTA account to the Defendants in the amount of $277,486.19 (the principal amount of the Investment Note) and mailed the check to Edmondson along with a cover letter, dated July 20, 2015 (the "**Yale Cover Letter**"), specifying that the payment was being provided as payment in full of "Promissory Note #2" (*i.e.* the Investment Note) and that Jones would separately address issues regarding "Promissory Note #1" (*i.e.* the Law Practice Note). *See* Plaintiff's App. 33, at p.46 (Yale Affidavit, ¶ 8) and pp.51-52 (copy of transmittal letter and issued check); *see also Joint Pretrial Order* [Docket No. 42] (the "PTO"), at p.4 (Stipulated Facts, ¶ 8).

On August 11, 2015, the $277,486.19 check was cashed, thereby effectuating the Transfer. *See* PTO, at p.3 (Stipulated Facts, ¶ 4). In disregard of the Yale Cover Letter, however, the Defendants purported to apply the payment towards both Promissory Notes (partially satisfying each) instead of solely towards the Investment Note. *See* Sherwood Aff., ¶ 2; Plaintiff's App. 33, at p.47 (Yale Affidavit, ¶ 10) and p.53 (copy of negotiated check); *see also* Plaintiff's App. 36, pp.63, 65 (Jones Rule 2004 Examination, at pp.94-95, 185). Thereafter, on April 1, 2016, a date within one year, but greater than 90 days, of the date of the Transfer, Jones filed for bankruptcy protection.

## DISCUSSION

### A. Summary Judgment Standards

Federal Rule of Civil Procedure 56, which is made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, provides that a court shall grant summary judgment on a claim or defense (or a part thereof) identified by the movant for such relief "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056. Based upon the language of Rule 56, in considering a motion for summary judgment a court must (a) determine whether a dispute exists with respect to a *material* fact involving the claim or defense (or part thereof); (b) determine whether the dispute is *genuine*; and (c) if the movant has successfully established the absence of a genuine dispute as to any material fact, determine whether the movant is entitled to judgment as a matter of law.

A fact is *material* to a claim or defense if its resolution can affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). "Factual disputes that are irrelevant or

unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248; *Topalian v. Ehrman*, 954 F.2d 1125, 1132 n.12 (5th Cir.) ("A grant of summary judgment is not precluded by a dispute as to [an] immaterial fact"), *cert. denied*, 506 U.S. 825 (1992). A factual dispute is *genuine* only if the evidence is such that a reasonable factfinder could return a verdict or ruling for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248. In asserting that a fact is genuinely disputed, or alternatively that the fact cannot be genuinely disputed, Rule 56 mandates that the party making such assertion support it by citing particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials (or by showing that the materials cited do not establish the absence or presence, as applicable, of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact). Fed. R. Civ. P. 56(c)(1). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

In considering such matters, it is also important remember that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a *genuine* issue for trial." *Liberty Lobby*, 477 U.S. at 249 (emphasis added); *see also Plyant v. Hartford Life & Accident Ins. Co*., 497 F.3d 536, 538 (5th Cir. 2007); *United States v. An Article of Food Consisting of 345/50-Pound Bags*, 622 F.2d 768, 773 (5th Cir. 1980). Consequently, this means that "the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party." *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007), *cert. denied*, 552 U.S. 1166 (2008); *see also Matsushita Elec. Indus*., 475 U.S. at 587. Stated another way, "[i]n reviewing the evidence, the court must disregard all evidence favorable to the moving party that the [factfinder] is not required

to believe, and should give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached." *Peel & Co., Inc. v. Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001).

Finally, with respect to the parties' shifting burdens, the party seeking summary judgment "bears the initial responsibility of informing the [ ] court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celetox Corp. v. Catrett*, 477 U.S. 317, 323 (1986). And where the burden at trial on the claim or defense at issue rests on the non-movant, "the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000); *see also Celetox Corp.*, 477 U.S. at 322 (movant defendant may satisfy initial burden in relation to cause of action asserted against her by demonstrating lack of evidentiary support for any one particular element of the cause of action). Once the moving party has satisfied the initial burden, the non-movant must show with "significant probative evidence" that a genuine issue of material fact exists. *Hamilton*, 232 F.3d at 477. In doing so, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586. "Mere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *Topalian*, 954 F.2d at 1131.

## B. *Plaintiff's Fraudulent Transfer Claim*

Pursuant to Section 548 of the Bankruptcy Code, a transfer of property of the debtor made within two years of the debtor's bankruptcy filing may be avoided by a trustee if the transfer was

made with *actual fraudulent intent* or was *constructively fraudulent*. As relevant to this case, Section 548 provides in pertinent part:

> The trustee may avoid any transfer … of an interest of the debtor in property … that was made … within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> (A) made such transfer … with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made …, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer …; and
>
> > (ii) (I) was insolvent on the date that such transfer was made …, or became insolvent as a result of such transfer…;
> >
> > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]
> >
> > (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured[.]

11 U.S.C. § 548(a)(1). Plaintiff seeks to avoid the Transfer at issue in this case as both actually fraudulent and constructively fraudulent. Because the parties principally focus their arguments on the constructive fraud prong of Section 548, the Court likewise begins its discussion with constructive fraud.

### 1. *Avoidance Under Constructive Fraud Prong of Section 548*

The Plaintiff bears the burden of proving all elements of a fraudulent transfer. *Mancuso v. T. Ishida USA, Inc. (In re Sullivan)*, 161 B.R. 776, 779 (Bankr. N.D. Tex. 1993). In order to succeed on an avoidance claim under the constructive fraud prong of Section 548, a plaintiff must establish, among other things, that the debtor "received less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(1)(B)(i). The failure to establish this element is fatal to such an avoidance claim. *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1494 (5th Cir.), *cert. denied*, 510 U.S. 821 (1993). Defendants assert that Plaintiff cannot satisfy the less

than reasonably equivalent value element of her constructive fraud claim because the Transfer satisfied a corresponding amount of antecedent debt owed by Jones to the Defendants under the Promissory Notes which, as a matter of law, constitutes reasonably equivalent value.[6]

### *Application of the Transfer*

In responding to Defendants' argument, Plaintiff initially asserts that summary judgment is precluded by the factual dispute that exists as to which of the Promissory Notes the Transfer was applied. In this regard, Plaintiff asserts that the Transfer could only have been applied against the Investment Note given Jones' limited authorization and the communication of same by Yale pursuant to the Yale Cover Letter. While it is true that the Defendants attempted to apply the Transfer to both Promissory Notes in contravention of the clear and unambiguous direction of Yale in the Yale Cover Letter, in accepting the Transfer the Defendants were legally obligated to apply the Transfer solely towards satisfaction of the Investment Note.

"A debtor making a voluntary partial payment of his indebtedness to a creditor may direct to which portion of the indebtedness the payment shall be applied, and the creditor *must* apply the payment as directed or return it." *S.S. Silberblatt, Inc. v. United States*, 353 F.2d 545, 548 (5th Cir. 1965) (emphasis added) (citing *Jones v. United States*, 48 U.S. 681, 687 (1849)); *see also Eylar v. Read*, 60 Tex. 387, 389 (1883) ("The rule in reference to the appropriation of payments is that the debtor may designate to what particular debt a payment shall be applied, where he owes more than one distinct debt to the creditor, and that such designation precludes the creditor from otherwise

---

[6] Defendants additionally and alternatively argue that, based upon Jones' relationship to and alleged identity of interest with Aquaphex and the Jones law firm, Jones also indirectly received reasonably equivalent value from the value allegedly directly realized by Aquaphex and the Jones law firm from the reduction in their respective alleged exposure to the Defendants upon Jones' payment on the Investment Note and Law Practice Note. *See generally* Defendants' Brief, at pp.11-12, 14-15 (¶¶ 29-32, 37-39). Because this alternative argument is highly fact intensive and the summary judgment record does not sufficiently support summary judgment on this basis, such argument is not addressed further herein.

appropriating it"); *Fuqua v. Moody & Clary Co.*, 462 S.W.2d 321, 323 (Tex. Civ. App.—Houston [14th Dist.] 1970, no writ); *Snow v. Gibraltar Life Ins. Co. of America*, 326 S.W.2d 501, 505 (Tex. Civ. App.—Dallas 1959, writ ref'd n.r.e.). Therefore, because as a matter of law Plaintiff is correct in her assertion that the Transfer was solely allocable to the Investment Note, there is no factual dispute to resolve on this point and the Transfer will be deemed to have been applied solely to the Investment Note.

### *Satisfaction of Antecedent Debt as Reasonably Equivalent Value*

Turning to Defendants' first argument with respect to reasonably equivalent value – namely, that the Transfer's satisfaction of antecedent debt constituted reasonably equivalent value in exchange for the Transfer – it is important to initially note that Section 548 neither defines the phrase "reasonably equivalent value" nor the terms "reasonably" or "equivalent." It does, however, define "value" as including the satisfaction of an antecedent debt of the debtor. *See* 11 U.S.C. § 548(d)(2)(A). Thus, Defendants argue that because the Transfer resulted in the dollar-for-dollar satisfaction of amounts owing by Jones under the Promissory Notes (limited to consideration of the Investment Note for the reasons noted above) – the antecedent debt – then such "value" constituted reasonably equivalent value immunizing the Transfer from avoidance.

Courts have regularly held that "when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent." *Walker v. Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010); *see also Southeast Waffles, LLC v. United States Dep't of Treasury/IRS (In re Southeast Waffles, LLC)*, 460 B.R. 132, 140 (6th Cir. B.A.P. 2011) ("There is considerable case law holding that a dollar for dollar reduction in debt is sufficient to establish equivalent value"), *aff'd*, 702 F.3d 850 (6th Cir. 2012). Thus, where a payment results in the corresponding dollar-for-dollar satisfaction of amounts owing by a debtor under a promissory note,

then the payment is not avoidable as a constructively fraudulent transfer under Section 548.  *See Official Committee of Unsecured Creditors of Propex Inc. v. BNP Paribas (In re Propex Inc.)*, 415 B.R. 321, 324 (Bankr. E.D. Tenn. 2009) (debtor received reasonably equivalent value from payment because payment reduced the principal balance of the indebtedness dollar-for-dollar); *Pardo v. Gonzaba (In re APF Co.)*, 308 B.R. 183, 187 (Bankr. D. Del. 2004) (failure to state a claim for constructive fraud under § 548 because "the payments made on the promissory note were made for value – satisfaction of an antecedent debt").

Plaintiff does not take issue with the general proposition that payment of an antecedent debt constitutes reasonably equivalent value.  Instead, Plaintiff argues that no value was realized at all because the Investment Note did not constitute a valid antecedent debt.  In this regard, Plaintiff reasons that because "the Revenue Sharing Agreement only contained a contingent obligation on the part of Aquaphex to pay the Sherwoods, if and when a plant was up and running and generating a profit, Jones' later promise to reimburse the Sherwoods' investment in Aquaphex was an unenforceable promise," and thus "[n]either the [Initial Investment Note] nor the replacement Investment Note from [Jones] to the Defendants were enforceable obligations against [Jones] as they lacked consideration."  *See* Plaintiff's Brief, at p.6 (¶¶ 10-11).

Consideration is a fundamental element of every valid contract.  *Quinlan v. AFI Services, LLC (In re AFI Services, LLC)*, 486 B.R. 827, 836 (Bankr. S.D. Tex. 2013) (citing *Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997)).  "Consideration is a present exchange bargained for in return for a promise."  *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991).  Consideration may take many forms.  "It can be either a benefit to the promisor or a detriment to the promisee.  It may consist of some right, interest, or profit, or benefit that accrues to one party, or, alternatively, of some forbearance, loss or responsibility that is undertaken or

incurred by the other party." *Copeland v. Alsobrook*, 3 S.W.3d 598, 606 (Tex. App.—San Antonio 1999, pet. denied) (citation omitted); *see also Solomon v. Greenblatt*, 812 S.W.2d 7, 15 (Tex. App.—Dallas 1991, no writ). Accordingly, it may, for example, take the form of a bargained-for return promise, provided the return promise is for something not within the requirements of a preexisting duty. *Quinlan*, 486 B.R. at 836; *Copeland*, 3 S.W.3d at 606 ("A promise for a promise is sufficient consideration in Texas"); *see also Diamond Paint Co. v. Embry*, 525 S.W.2d 529, 533 (Tex. Civ. App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.).

Plaintiff appears to suggest that because Aquaphex's payment obligation to the Defendants was allegedly worthless as contingent in nature,[7] then Jones' promise to effectively accelerate and cover such obligation up to the initial $250,000 investment was correspondingly provided for no consideration. Plaintiff's focus on the value of Aquaphex's obligations under the Revenue Share Agreement, however, is misguided. In evaluating whether Jones' promise was supported by consideration, the focus must, instead, be on what benefit Jones obtained, or what detriment the Defendants incurred, in exchange for the promise. Properly refocused on this relevant inquiry, it is undisputed that in exchange for Jones' promise to the Defendants, Jones received both (a) the Defendants' promise to pay him $240,000 in one lump sum payment in conjunction with the Share Purchase Agreement (which amount was, in fact, paid to Jones), and (b) Aquaphex's promise to reimburse Jones for the amount of the $250,000 that he pays to the Defendants on behalf of Aquaphex (such amount to be reimbursed out of revenues that would otherwise have been payable to the Defendants under the terms of the Revenue Sharing Agreement). *See* SPA, ¶¶ 2-3, 6.y.; Sherwood Aff., ¶ 19. While Plaintiff may question the wisdom of making such a deal, these return

---

[7] Plaintiff's argument on this point is, frankly, difficult to follow and does not square with the testimony of Jones. *See* Plaintiff's App 35, at p.59 (Jones Affidavit, ¶17 (second ¶17)) (reflecting Jones' belief that Aquaphex had value in recalling that "[w]e all had expectations that the return on our investments in Aquaphex would be starting much sooner…."). Just because an obligation is contingent does not necessarily render the obligation worthless.

promises in favor of Jones were clearly sufficient to constitute valid consideration for Jones' promised payments under the Jones Agreement. Accordingly, the Initial Investment Note, being a documented component of the Jones Agreement, was validly supported by consideration.

Thereafter, while Defendants paid the additional $240,000 to Jones, Jones never made a single payment under the Initial Investment Note. In the face of this breach, instead of exercising their right to pursue immediate collection on the Initial Investment Note following the note's maturity in February 2015, the Defendants, with the aid of counsel, agreed to a restructuring of the obligations – with an extended payment schedule – in exchange for Jones' execution of the replacement Investment Note (in a face amount equal to the principal amount of the Initial Investment Note plus interest) and the Security Agreement to provide security. Thus, as to this second step of the consideration inquiry, despite Jones' conclusory assertions to the contrary,[8] Jones' promise to pay under the terms of the replacement Investment Note was also supported by consideration, being the Defendants' agreement to the restructuring of the Initial Investment Note obligations.[9] *See also Copeland*, 3 S.W.3d at 606 (recognizing that an agreement to forbear from taking action may constitute consideration).

---

[8] In conclusory fashion, Jones avers that the Defendants "gave me no consideration for the Investment Promissory Note" and that he "understand[s] that [his] payment of the Investment Note was really payment on an unenforceable note because he [sic.] Sherwoods never gave me any consideration for signing the Investment Note." *See* Plaintiff's App. 35, at pp.58-59 (Jones Affidavit, ¶¶ 15 and 17 (second ¶ 17)). Such affidavit testimony carries no weight because mere conclusory allegations are not competent summary judgment evidence. *Topalian*, 954 F.2d at 1131.

[9] *See* Sherwood Aff., ¶¶ 15, 20. Defendants effectively argue the same point in relation to their affirmative defense under Section 548(c) of the Bankruptcy Code. In this regard, Defendants premise their argument with the statement that "Section 548(c) provides, in short, that an obligee acting in good faith may enforce any *obligation* incurred to the extent that such obligee gave value to the debtor in exchange for such *obligation*." Defendants' Brief, at p.12 (¶ 33) (emphasis added). Importantly, however, Plaintiff has not asserted a claim under Section 548 to avoid the underlying "obligation" – being the Investment Note; she has only challenged the validity of such obligation on the basis of lack of consideration. Plaintiff's avoidance claim is solely focused on the *Transfer* made on account of the obligation. Thus, Defendants' defensive arguments under Section 548(c) in relation to the underlying Investment Note obligation have no direct applicability to the actual matter in dispute.

Thus, because the Transfer was made to the Defendants on account of a valid antecedent debt – namely, the Investment Note – and resulted in a dollar-for-dollar satisfaction of amounts owed by Jones to the Defendants under the Investment Note, Jones received reasonably equivalent value for the Transfer, thereby immunizing the Transfer from attack as a constructively fraudulent transfer under Section 548 of the Bankruptcy Code.   Accordingly, Defendants are entitled to judgment as a matter of law on this aspect of Plaintiff's fraudulent transfer claim.

### 2.    *Avoidance Under Actual Fraud Prong of Section 548*

Plaintiff also asserts in the Complaint that Jones made the Transfer with the actual intent to hinder and delay his creditors "by having the same sent from an account held by Roger Yale", thereby allegedly hindering and delaying Jones' creditors "from discovering the funds he had and the Transfer." *See* Complaint, ¶ 31.  Neither of the parties devote much attention to this prong of the fraudulent transfer claim in the briefing.  Defendants simply argue in connection with their antecedent debt arguments that, as a matter of law, "[a] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another."  Defendants' Brief, at p.10 (¶27) (citing *Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91, 599 N.Y.S.2d 816 (N.Y. App. Div. 1993)).  As for Plaintiff, outside of challenging the validity of the Investment Note and, by extension, the existence of any antecedent debt, Plaintiff does not elaborate on, or attempt to further support, the actual fraud prong of her fraudulent transfer claim – and perhaps for good reason given the content of the affidavit testimony submitted by Plaintiff in opposition to the Motion.

In this regard, while Plaintiff had the benefit of Jones' affidavit testimony in responding to Defendants' Motion, nowhere within the Jones affidavit is there any mention of any intent by Jones to hinder or delay any of his creditors by having the Transfer sent from the Yale IOLTA account.

*See* Plaintiff's App. 35 (Jones Affidavit).  Plus, more significantly, in the Yale affidavit also submitted by Plaintiff, Yale puts to rest any conceivable question regarding such intent.  As explained by Yale, because Jones "was the subject of pending disciplinary actions before the State Bar, was being sued by the SEC, had numerous unpaid creditors, and had just agreed to surrender his law license, Mr. Jones wanted these funds out of his hands and he requested my [Yale's] assistance and counsel in the distribution of the funds."  Plaintiff's App. 33, at p.46 (Yale Affidavit, ¶ 3).  Accordingly, because of the lack of evidentiary support for the alleged actual intent of Jones to hinder or delay his creditors, as asserted within the Complaint, Defendants are entitled to judgment as a matter of law on the actual fraud prong of Plaintiff's fraudulent transfer claim as well.

## C.  *Plaintiff's Preferential Transfer Claim*

Turning next to Plaintiff's claim for avoidance of the Transfer as a preferential transfer under Section 547 of the Bankruptcy Code, the burden of proof on all elements of the claim rests with Plaintiff.  11 U.S.C. § 547(g).  Thus, among other things, because the Transfer occurred greater than 90 days prior to (but within one year of) the Petition Date, Plaintiff must establish that the Defendants were "insiders" of Jones at the time of the Transfer in order to prevail.  *See* 11 U.S.C. § 547(b)(4).  Defendants assert that Plaintiff cannot meet this burden as a matter of law.

While the term "insider" is included within the definitional provisions of Section 101 of the Bankruptcy Code, Section 101 merely enumerates specific categories of relationships that are deemed to confer "insider" status instead of describing what causes a particular relationship to qualify for "insider" status.  *See* 11 U.S.C. § 101(31).  Those who fall within these statutorily-enumerated categories are often referred to as "statutory insiders."  For purpose of this case,

Section 101(31) of the Bankruptcy Code identifies the following categories of individuals[10] as statutory insiders of an individual debtor:

> The term "insider" includes –
>
> (A) if the debtor is an individual –
>
> > (i)    relative of the debtor or of a general partner of the debtor; [or]
> > . . .
> > (iii)   general partner of the debtor[.]

11 U.S.C. § 101(31)(A).

In addition to statutorily-idenitifed insiders, a court must also consider the possibility of "non-statutory insider" status. This is because the predicate word "includes" in Section 101(31) compels the conclusion that the statutorily-enumerated listing of insiders in Section 101(31) is a non-exhaustive listing, leaving the door open to the possibility of other types of relationships conferring "insider" status. *See U.S. Bank Nat'l Ass'n v. Village at Lakeridge, LLC*, 138 S.Ct. 960, 963 (2018); *Think3 Litigation Trust v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 190 (Bankr. W.D. Tex. 2015); *see also* 11 U.S.C. § 102(3) ("'includes' and 'including' are not limiting"). And in analyzing other types of relationships, while some courts have effectively framed the inquiry as one of control – *i.e.* whether the nature of the parties' relationship at the time of the transaction at issue was such that the alleged insider had the ability to exert control or influence over the debtor's actions[11] – most courts have found that, while the existence of control may compel a finding of

---

[10] The other statutorily-enumerated categories of insiders identified in Section 101(31) as applicable to an individual debtor are not applicable to this case. *See* 11 U.S.C. § 101(31)(A)(ii), (A)(iv), (E) and (F) (referencing a partnership, corporation, affiliate, insider of an affiliate, and managing agent).

[11] *See, e.g., Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir. 1996) (to establish non-statutory insider status, the alleged insider "must exercise sufficient authority over the debtor so as to unqualifiedly dictate corporate policy and the disposition of corporate assets") (quoting *Hunter v. Babcock (In re Babcock Dairy Co.)*, 70 B.R. 662, 666 (Bankr. N.D. Ohio 1986)); *Salisbury v. Texas Commerce Bank-Houston, N.A. (In re WCC Holding Corp.)*, 171 B.R. 972, 987 (Bankr. N.D. Tex. 1994) ("To become an insider, a lender must be able to unqualifiedly dictate a corporate debtor's policy and its disposition of assets"); *Huizar v. Bank of Robstown (In re Huizar)*, 71 B.R. 826, 831 (Bankr. W.D. Tex. 1987) ("The purpose of the insider provisions of the Code is to protect general creditors from over-reaching by those with special power or influence over the debtor").

insider status, insider status is not dependent upon a finding of control and can instead be found to exist where the closeness of the parties' relationship was so great at the time of the transaction that it can be fairly determined that the transaction was not conducted at arm's length but rather on the basis of the parties' affinity.[12]  Consistent with the latter approach, the Fifth Circuit has identified two factors to consider in evaluating whether a transferee of a debtor qualifies as a non-statutory insider of the debtor:

    (1)    The closeness of the relationship between the transferee and the debtor; and

    (2)    Whether the transaction between the transferee and the debtor was conducted at arm's length.

*Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

       Defendants assert that Plaintiff has failed to allege or produce facts that would support a determination of their insider status with Jones.  *See* Defendants' Brief, at pp.7-8; Sherwood Aff., ¶¶ 24, 26-27.  More pointedly with respect to the consideration of non-statutory insider status, Defendants emphasize the fact that by the time of the Transfer (the relevant point of inquiry),[13] their relationship with Jones had so deteriorated that the parties only dealt with each other through counsel.  *See* Sherwood Aff., ¶ 27.

---

[12] *See, e.g., U.S. Bank N.A. v. The Village at Lakeridge, LLC (In re The Village at Lakeridge, LLC)*, 814 F.3d 993, 1001 (9th Cir. 2016) ("[A]ctual control is not required to find non-statutory insider status"), *aff'd*, 138 S.Ct. 960 (2018); *Schubert v. Lucent Techs. Inc. (In re Winstar Comms., Inc.)*, 554 F.3d 382, 396 (3rd Cir. 2009) ("[W]e hold that it is not necessary that a non-statutory insider have actual control; rather, the question 'is whether there is a close relationship [between debtor and creditor] and … anything other than closeness to suggest that any transactions were not conducted at arm's length'") (quoting *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1277 (10th Cir. 2008)); *Seaver v. Glasser (In re Top Hat 430, Inc.)*, 568 B.R. 314, 319 (8th Cir. B.A.P. 2017) ("the ultimate issue is whether the creditor has a sufficiently close relationship … to presume that the creditor unfairly received special treatment"); *In re Premiere Network Servs., Inc.*, 333 B.R. 126, 129 (Bankr. N.D. Tex. 2005) ("The determination of an extra-statutory insider turns on whether the closeness of the relationship is so great that the advantage gained by the creditor is attributable to affinity rather than course of business dealings"); *see also* S. Rep. No. 95-989, at 25 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5810 ("An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at [arm's] length with the debtor").

[13] 11 U.S.C. § 547(b)(4)(B) (providing for look back period of up to one year before the date of the bankruptcy filing "if such creditor *at the time of such transfer* was an insider") (emphasis added).

In the Complaint, Plaintiff asserts that Defendants were "insiders as defined by 11 U.S.C. § 101(31)(A)(i)," and that "[a]s co-owners of Aquaphex with the Debtor and parties to a revenue-sharing agreement with Aquaphex, Defendants were insiders at the time of the Transfer." Complaint, ¶¶ 34-35.  With respect to the first assertion under Section 101(31)(A)(i) of the Bankruptcy Code, Plaintiff has failed to present any evidence of either of the Defendants being a relative of Jones or a relative of any general partner of Jones.  *See* 11 U.S.C. § 101(31)(A)(i) (defining "insider" as a "relative of the debtor or of a general partner of the debtor"); *see also* Sherwood Aff., ¶ 26.  With respect to the latter assertion, while Plaintiff does not specify whether she is asserting statutory or non-statutory insider status on account of the Defendants' asserted connections to Aquaphex, what is clear is that Plaintiff is relying upon such Aquaphex connections in seeking to establish insider status.  In doing so, Plaintiff appears to erroneously conflate insider status as to Aquaphex with insider status as to Jones.  In this regard, a substantial portion of Plaintiff's summary judgment briefing and evidence is seemingly devoted to demonstrating the existence of a fact issue as to the Defendants' insider status *as to Aquaphex*.  For example, Plaintiff argues:

- "Defendants' counsel received numerous emails during the course of discovery, none of which have been refuted, which show that the ***Sherwoods were insiders*** with the Debtor ***in Aquaphex*** and were included in updates and decisions within a month of the Transfer …. The evidence also supports the ***involvement of the Sherwoods as members of Aquaphex***, and as ***part of what was referred to as 'the board', 'the team', the 'executive team' and 'the owners'…. Not all investors were in this circle.  This evidence supports that Defendants were insiders***." Plaintiff's Brief, at pp.1-2 (¶ 2) (emphasis added).

- "These pieces of evidence [referring to the sampling of emails summarized in paragraph 3 of Plaintiff's Brief among Jones, one or both of the Defendants, and various others concerning Aquaphex], ***in addition to the revenue entitlement and share ownership of the Sherwoods*** with Jones ***in Aquaphex***, taken in their totality, clearly ***support the insider role of the Sherwoods***, along with Jones, ***in the business of Aquaphex***…."  Plaintiff's Brief, at p.5 (¶ 4).

The problem with Plaintiff's focus, however, is that the relevant insider inquiry under Section 547 of the Bankruptcy Code is whether the Defendants were insiders *of Jones, the debtor transferor* – not Aquaphex. Refocused on Jones, Plaintiff has failed to show with "significant probative evidence" that a genuine issue of material fact exists. *Hamilton*, 232 F.3d at 477.

First, with respect to statutory insider status, Plaintiff does not allege in the Complaint that either of the Defendants was a general partner of Jones. But to the extent that Plaintiff is implicitly asserting (in reference to Section 101(31)(A)(iii) of the Bankruptcy Code) that the Defendants' 4% co-ownership of Aquaphex and their existence as parties to the Revenue Share Agreement supports the existence of a general partnership between the Defendants and Jones, such assertion similarly lacks evidentiary support in the summary judgment record inasmuch as there is no evidence of Aquaphex's existence as a partnership. *See, e.g.,* Sherwood Aff., Exh. F, at p.8 (signature page of Share Purchase Agreement, referring to Aquaphex as a "Texas Limited Liability Company"); Plaintiff's Brief, at p.2 (referring to Defendants as "members" of Aquaphex, thereby acknowledging Aquaphex's existence as a limited liability company).

Second, with respect to non-statutory insider status, while Plaintiff has presented evidence of the existence of a relationship between the Defendants and Jones as co-owners of Aquaphex and, given Jones' role with Aquaphex, on account of the existence of the Defendants as parties to the Revenue Share Agreement – as alleged in the Complaint – Plaintiff has failed to point the Court to significantly probative evidence of the fact that such relationship was so great at the time of the Transfer that it can be fairly determined that the Transfer was not conducted at arm's length but rather on the basis of the parties' affinity. Indeed, as evidenced by the Yale affidavit submitted by Plaintiff, not only were the Defendants and Jones represented by separate counsel at the time of the Transfer, but the Transfer was not made until after Yale had attempted to negotiate the terms

of the payment with the Defendants by and through their counsel, Edmondson.  *See* Plaintiff's

App. 33, at p.46 (Yale affidavit, ¶¶ 6-8).  Thus, Plaintiff's own evidence is indicative of the parties'

arm's-length dealing with respect to the Transfer.  Accordingly, Plaintiff has likewise failed to

establish the existence of a genuine dispute with respect to the Defendants' status as non-statutory

insiders of Jones at the time of the Transfer.  *See Matsushita Elec. Indus.*, 475 at 586 (the non-

movant "must do more than simply show that there is some metaphysical doubt as to the material

facts").

## *CONCLUSION*

In summary, for the reasons set forth above, the Court concludes that:

(a)     in relation to Plaintiff's fraudulent transfer claim under Section 548(a)(1)(B) of the Bankruptcy Code, Plaintiff has failed to establish the existence of a genuine dispute with respect to Jones' receipt of less than a reasonably equivalent value in exchange for the Transfer, as required by Section 548(a)(1)(B)(i) of the Bankruptcy Code;

(b)     in relation to Plaintiff's fraudulent transfer claim under Section 548(a)(1)(A) of the Bankruptcy Code as alleged in the Complaint, Plaintiff has failed to establish the existence of a genuine dispute with respect to Jones' actual intent to hinder or delay any entity to which he was or became, on or after the date of the Transfer, indebted;

(c)     in relation to Plaintiff's preferential transfer claim under Section 547(b) of the Bankruptcy Code, Plaintiff has failed to establish the existence of a genuine dispute with respect to Defendants' status as insiders of Jones at the time of the Transfer, as required by Section 547(b)(4)(B) of the Bankruptcy Code; and

(d)     because of the non-avoidability of the Transfer, there is also no basis for Plaintiff's request for recovery under Section 550 of the Bankruptcy Code.[14]

Thus, based upon the foregoing, Defendants are entitled to judgment as a matter of law.

Accordingly, the Court will separately enter an order of summary judgment in favor of Defendants.

### # # #   END OF MEMORANDUM OPINION   # # #

---

[14] Section 550 only provides for recovery "to the extent that a transfer is avoided" under an avoidance provision such as Section 548 of the Bankruptcy Code.  *See* 11 U.S.C. § 550(a).